IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

JOHN P. RYAN, JR. on behalf of himself and all others similarly situated,

Plaintiff,

v.

CAL-MAINE FOODS, INC, ROSE ACRE FARMS, INC.; OPAL FOODS, LLC; VERSOVA HOLDINGS, LLC; HILLANDALE FARMS OF PA., INC.; HILLANDALE-GETTYSBURG, LLC., HILLANDALE FARMS EAST, INC; HILLANDALE FARMS, INC.; DAYBREAK FOODS, INC.; URNER BARRY PUBLICATIONS, INC. d/b/a EXPANA; EGG CLEARINGHOUSE, INC.; UNITED EGG PRODUCERS d/b/a EGG FARMERS OF AMERICA; and JOHN DOES 1-10

Defendants.

Case No. [______________]

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

## I. INTRODUCTION

1. This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize prices for conventional fresh shell eggs (referred to here as "shell eggs" or simply "eggs") from at least as early as January 1, 2022, until Defendants' unlawful conduct and its anticompetitive effects cease to persist. ("Class Period"). Plaintiff and the Class seek damages as purchasers of Shell Eggs. Shell eggs are eggs purchased in their natural state in the shell.

2. Starting as late as February 1, 2022, Defendants and their co-conspirators used Urner Barry (now called "Expana") to collusively fix, raise, maintain and stabilize the supply and price of shell eggs sold in the United States above competitive levels. During the Class Period (defined below), the United States Bureau of Labor Statistics reported that the price of eggs soared from under $2 per dozen to as high as $6.22 per dozen in March of 2025.[1]

3. Defendants Cal-Maine, Rose Acre, Opal Foods, Versova, Hillandale, and Daybreak (together referred to as "Egg Producer Defendants") are the among the biggest egg producers in the United States. Together they own almost half of all egg-laying commercial hens.

4. Defendant Urner Barry is a publisher that collects, analyzes, and disseminates detailed and current information to its customers in the egg, poultry, meat, seafood, plant protein, and related segments of the food industry. Urner Barry provides actionable competitive intelligence related to the egg market to the Egg Producer Defendants and other egg producers.

5. As part of their unlawful agreement, the Egg Producer Defendants reported inflated "assessments" of egg prices to Urner Barry. Urner Barry then published price quotes using the subjective information provided by its subscribers, including the Egg Producer Defendants. It also

---

[1] United States Bureau of Labor Statistics, Average Price: Eggs, Grade A, Large (Cost Per Dozen) in U.S. City Average, at https://fred.stlouisfed.org/series/APU0000708111.

incorporated transaction prices from an online spot market provided by Defendant ECI—a private, members-only spot market for buying and selling eggs.

6. The relatively small number of transactions on the ECI, combined with Defendants' large size, enabled the Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote.

7. Urner Barry's price quotes serve as a benchmark for the pricing of Defendants' sales of Conventional Eggs.

8. In this way, Urner Barry and ECI amplify price swings led by the largest-volume producers and prevent independent, competitive decision-making by others.

9. Defendants' manipulation of the Urner Barry benchmark allowed them to sustain ever-increasing price hikes on their customers.

10. Defendants have repeatedly blamed higher prices during the Class Period on Highly Pathogenic Avian Influenza H5N1 ("HPAI"), which led to the culling of millions of layer hens beginning in late 2021.

11. In reality, however, the impact of HPAI does not account for the unprecedented surge in egg prices during the Class Period. Rather, the Egg Producer Defendants have used HPAI as a pretext to dramatically increase egg prices to the detriment of Plaintiff and the Class.

12. Nor do input costs explain egg prices during the Class Period. Economic research shows that key inputs to egg production fell while egg prices continued to increase.

13. Defendants were able to implement price increases and collectively raise prices because their industry is structurally susceptible to collusion. Among other things, the U.S. Conventional Egg market features a commodity product, highly concentrated and vertically integrated producers, high entry barriers, inelastic demand, and numerous opportunities to collude.

14. Prices for conventional eggs only fell after Defendants' unlawful behavior came to light in March 2025. At that time, it was revealed that the United States Department of Justice, Antitrust Division, ("DOJ") was investigating the egg industry for price fixing. According to news reports, several defendants including Cal-Maine, Rose Acre, and Urner Barry are under investigation. The New York Attorney General is also investigating anticompetitive conduct and high prices in the egg industry.

15. Defendants' conspiracy caused Plaintiff and members of the Classes to pay supracompetitive prices for shell eggs during the Class Period.

16. To provide a remedy for the injury suffered as a result of Defendants' conspiracy and illegal actions, Plaintiff bring this case on behalf of end purchasers of shell eggs against Defendants for violations of Section 1 of the Sherman, state antitrust and consumer protection laws, and under common law for unjust enrichment. Plaintiff seek damages, injunctive relief, disgorgement of illegally-obtained profits and the costs of pursuit of this action, including reasonable attorneys' fees, for the injuries that Plaintiff and Class Members sustained as a result of the Defendants' conspiracy to fix, raise, maintain and/or stabilize the price, and limit, reduce and otherwise manipulate the supply, of shell eggs.

## II. JURISDICTION AND VENUE

17. Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for injunctive relief, including reasonable attorneys' fees and costs of this litigation, for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also brings this action pursuant to state antitrust and consumer protection laws for damages, the common law of unjust enrichment, for disgorgement of illegally-obtained profits, and, where available by law, reasonable attorneys' fees and costs of this litigation.

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

19. This Court has supplemental subject matter jurisdiction over the pendent state antitrust and consumer protection law claims under 28 U.S.C. § 1367 because all their claims arise from the same facts and circumstances and form part of the same case or controversy.

20. The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d) because (a) there are more than 100 members of the Class; (b) citizenship of at least one proposed Class member is different from that of any Defendant; and (c) matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

21. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district.

22. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of eggs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Further jurisdictional contacts are alleged below.

## III. PARTIES

23. Within the Class Period, each Plaintiff purchased shell eggs in the state in which they reside or conduct business and suffered an economic injury as a result of Defendants' illegal conduct described in this Complaint. Plaintiff intends to purchase shell eggs in the future.

### A. Plaintiff

24. Plaintiff John P. Ryan, Jr. is a citizen of Missouri and paid for the purchase price of eggs for personal or household use during the Class Period.

### B. Egg Producer Defendants

#### 1. Cal-Maine

25. Defendant Cal-Maine Foods, Inc. is Delaware corporation doing business in the state of Missouri. Defendant's principal office is located at 1052 Highland Colony Pkwy Ste 200 Ridgeland, MS 39157. Cal-Maine may be served with process through its Missouri registered agent, CSC-Lawyers Incorporating Service Company, 221 Bolivar Street Jefferson City, MO 65101.

26. Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Over the years, Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024 alone, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

27. Today, Cal-Maine is the largest producer of eggs in the United States. As of 2024, Cal-Maine had nearly 45 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is also a fully integrated company with its operations consisting of hatching chicks; growing and maintaining chicken flocks; manufacturing feed; and producing, processing, packaging and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozens of eggs sold.

28. Cal-Maine has egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

29. Specifically in Missouri, Cal-Maine has operating locations for Feed Mills, Hatcheries, Processing and Packaging, and Egg Products Processing Facilities.[2]

30. Cal-Maine also operates a facility in Missouri use in shell egg and egg products production "to enhance our supply and distribution capabilities for customers in Missouri and surrounding areas."[3]

31. Upon information and belief, Cal-Maine subscribes to Urner Barry and its egg prices are tied to Urner Barry's egg price index.

**2. Rose Acre**

32. Rose Acre Farms, Inc. is a private company incorporated in Indiana with its principal place of business at 1657 W Tipton Street, Seymour, Indiana 47274. Rose Acre may be served with process through its Missouri registered agent, URS Agents, Inc. 9666 Olive Boulevard, Suite 690, Saint Louis, MO 63132.

33. Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

34. Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

35. Specifically in Missouri, Rose Acre has multiple egg process facilities with job postings. Within this District, Rose Acre has facilities with job postings at its Knob Noster,

---

[2] https://www.calmainefoods.com/locations
[3] Cal-Maine Foods, Inc., Annual Report (Form 10-K) at 25 (July 23, 2024).

Missouri location and Marshall, Missouri location.[4] Additionally in Missouri, Rose Acre has job posting at its Hawk Point, Missouri facility.[5]

36. Further, in 2018, a Rose Acre executive confirmed its connection to "the great state of Missouri" by donating 30,000 eggs to the 2018 White House Easter Egg Roll, where Rose Acre "[a]s he second-largest egg producer in the United States, [was] proud to represent Rose Acres and Missouri at the White House."[6]

37. Upon information and belief, Rose Acre subscribes to Urner Barry and its egg prices are tied to Urner Barry's egg price index.

**3. Opal Foods**

38. Defendant Opal Foods LLC's principal place of business is located at 16194 Highway 59, Neosho, Missouri 64850. Opal Foods has acquired numerous large egg producers, including Sparboe.[7] Opal Foods is jointly owned by Rose Acre Farms and Weaver Eggs.[8]

39. Throughout the Class Period, Sparboe has delegating pricing to Urner Barry. For example, Sparboe was sued by the Attorney General of Minnesota in 2021 for price-gouging Eggs during the 2020 COVID-19 pandemic.[9] At the time, an email between Sparboe employees revealed that Sparboe raised prices according to Urner Barry stating, "[t]he UB report from today is very strong […] [t]he last time we had a big financial crisis in 2008, the UB skyrocketed. Eggs are counter cyclical, and this financial crisis could be worse than 2008, so the impact on egg prices

---

4 https://secure4.saashr.com/ta/6106820.careers?CareersSearch=&lang=en-US.
5 *Id.*
6 https://www.columbiamissourian.com/opinion/guest_commentaries/guest-commentary-from-the-farm-to-the-white-house-our/article_003a2890-3426-11e8-9d3f-c33895406eb3.html.
7 https://knsiradio.com/2024/03/06/sparboe-farms-in-litchfield-bought-by-missouri-producer/; *see also* https://www.wattagnet.com/top-poultry-companies/company/opal-foods.
8 https://www.eggindustry-digital.com/eggindustry/library/item/january_2025/4242200/?oly_enc_id=2782C9266756I4W
9 *State of Minnesota v. Sparboe Farms, Inc.,* Case No. 27-cv-21-10810 (Mn. Ct., Hennepin Cnty. 2021), at https://www.ag.state.mn.us/Office/Communications/2021/docs/Sparboe_Complaint.pdf

could be the same or greater […] so right now, we would want as many birds laying eggs as possible [. . .] [l]ets maximize our output-and make sure we are getting every egg in a carton or in a flat."[10]

40. On March 10, 2020, Sparboe president Beth Sparboe Schnell forwarded a daily afternoon email to a Sparboe sales manager from Urner Barry. Urner Barry's email discussed that reduced outputs as well as heightened demand had "led to strong buying interest" and higher price predictions.[11] When Schnell forwarded the email she wrote: "Here we go! Finally!! Hitting some 52-week highs. You're going to experience the first strong market since you started …. The question is – how high and how long?"[12] The sales manager replied: "I will take the ride!!!! We have been waiting for a long time!"[13]

41. On March 18, 2020, Schnell boasted that the Urner Barry price index had drastically increased by 21 cents (per dozen eggs) and foreshadowed "$3.00 eggs" as compared to the $1 price point a dozen eggs had been selling for just weeks prior.[14] In response to the email, Schnell's brother, Garth Sparboe, expressed concerns that attorneys general would be carefully analyzing commodities prices, recommended "moderation" and stated "hit[ting] a grand slam price on a load of eggs to the wrong wholesale customer could cause problems."[15]

42. Critically, Schnell instead opted not to listen to her brother, followed pricing guidelines set by Urner Barry and drastically increased prices – tripling the price of Sparboe eggs from $0.90 per dozen in early March 2020 to $2.96 per dozen by early April 2020.[16]

---

[10] *Id.* at 8.
[11] *Id.* at 7, ¶ 25.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 8, ¶ 28.
[15] *Id.* at 8, ¶ 29.
[16] *Id.* at 10, ¶ 35.

43. Opal Foods and Sparboe sell Eggland's Best and Land O'Lakes brands of Eggs.

### 4. Versova

44. Versova Holdings, LLC is a private company incorporated in Delaware with its principal place of business in Sioux Center, Iowa.

45. Versova is one of the largest egg producers in the United States. As of 2024, it had over 18 million egg-laying hens.

46. Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon.

47. Upon information and belief, Versova subscribes to Urner Barry and its egg prices are tied to Urner Barry's egg price index.

### 5. Hillandale Farms

48. Defendant Hillandale Farms is comprised of several related companies, including Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc.—all incorporated in Pennsylvania—and Hillandale Farms, Inc., incorporated in Ohio. Hillandale Farms is headquartered in Gettysburg, Pennsylvania.

49. Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. As of 2024, it had nearly 19 million egg-laying hens.

50. Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

51. Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

52. Upon information and belief, Hillandale Farms subscribes to Urner Barry and its egg prices are tied to Urner Barry's egg price index.

### 6. Daybreak Foods

53. Daybreak Foods, Inc. is a private company incorporated in Wisconsin with its principal place of business in Lake Mills, Wisconsin.

54. Daybreak Foods is one of the largest egg producers in the United States. It produces approximately 16 million eggs per day. As of 2024, it had over 20 million egg-laying hens.

55. Daybreak Foods has several egg production facilities in the United States, including in Wisconsin, Minnesota, Iowa, and Ohio.

56. Upon information and belief, Daybreak Foods subscribes to Urner Barry and its egg prices are tied to Urner Barry's egg price index.

## C. Egg Pricing Defendants

### 1. Urner Barry

57. Urner Barry Publications, Inc. is a private company incorporated in New Jersey with its principal place of business in Toms River, New Jersey. For decades Urner Barry has published egg prices to industry participants, including the Egg Producer Defendants.

58. Urner Barry began in the mid-1800s when New York City-based printer Benjamin Urner began publishing market reports providing pricing on various agricultural goods shipping in and out of New York. Initially, the report was called the "Producers' Price-Current," but later became known as the "Urner Barry's Price-Current." In the 1960's Urner Barry Company renamed itself to Urner Barry Publications and moved from New York to New Jersey.

59. From the mid-1970's onward, Urner Barry would begin to implement a slew of new publications and services covering various new markets. While Urner Barry had covered poultry and egg markets for decades, in 1975 Urner Barry broke into the seafood market with the debut of the Seafood Price Current. In 1976, Urner Barry would host the very first Executive Conference in New Jersey, an event that would grow to become the most widely attended and recognized

marketing event in the poultry and egg industries. In the 1990's, Urner Barry expanded its reporting into the beef, pork, lamb, and veal markets by acquiring National Provisioner's Yellow Sheet.

60. During the 21st century, Urner Barry introduced Comtell® On-Line ("Comtell"). According to Urner Barry, Comtell is "the most accessible, accurate and timely source for news, quotes and research" in the meat, poultry, pork, veal, seafood, and, critically for this case, egg industries. Comtell subscribers "are updated several times a day on the most impactful market conditions."

61. Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, the U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations under a single brand name: Expana.

**2. Egg Clearing House**

62. Defendant Egg Clearinghouse, Inc. is a Delaware corporation with its offices and principal place of business located in Dover, New Hampshire.

63. During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

64. Only ECI members (i.e., farmers and egg buyers) are allowed to trade on the ECI marketplace.

65. In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

66. ECI represents just 5% of the shell egg market but plays an outsized role in how eggs are priced nationwide.

### D. Trade Association Defendant

#### 1. United Egg Producers

67. Defendant United Egg Producers d/b/a Egg Farmers of America is a Maine corporation with its offices and principal place of business located in Johns Creek, Georgia.

68. UEP is a national cooperative of egg farmers representing the ownership of approximately 95% of all the nation's egg-laying hens.

69. The United Egg Association ("UEA") is a trade association affiliate with UEP. UEP formed the United Egg Association (UEA) in 1983. Expanded in 1995, UEA serves as a national trade association representing three distinct segments of the U.S. egg industry – further processors, allied members, and producers and packers.

### E. Unnamed Co-Conspirators and Other Non-Parties

70. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described: John Does 1-10. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

71. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

72. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Background of Egg Production in the United States

73. Eggs are one of the most popular foods in the United States. Eggs are not only an integral part of a typical American breakfast, but they are also commonly used in baked goods and added to any number of dishes, including salads, sandwiches, and even pizza.

74. The egg industry in the United States is massive. On average, America produces about 100 billion eggs per year. In 2023, the average American ate over 280 eggs over the course of a year.

75. The egg market is part of the broader poultry industry. Poultry production begins with primary breeders. Primary breeder flocks consist of elite (sometimes called pedigree or foundation) birds, great-grandparent birds, and grandparent birds. Grandparent flocks produce the final generation of breeding birds (multiplier/parent flocks). Eggs from multiplier flocks hatch to become production birds—broilers and egg-laying hens (also called "layers" or "layer hens")—for human consumption. Broiler chicks are shipped to production farms within a day of hatching, where they are raised for meat. Young hens are raised on pullet farms until they reach egg-laying age, then transported to egg production farms.

76. The egg production cycle is not volatile or subject to sudden, unmanageable shifts. Barring catastrophic events, egg output can be forecasted and adjusted with great precision.

77. This control makes it possible for producers to intentionally reduce supply, delay new flocks, or retire hens early—actions that, if taken collectively, can artificially constrain supply and raise prices.

78. Egg producers also maintain cold storage capacity, allowing for inventory management that can further distort apparent supply levels. Producers may withhold eggs from the market during times of low prices or release excess inventory when market prices are favorable.

79. The cycle's predictability and the long lead times for production decisions create conditions ripe for anticompetitive coordination.

80. The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a comprehensive and detailed system of grading and sizing standards that ensures uniformity across the shell egg market. Specifically, USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer.

81. The United States egg industry produces eggs for two primary uses: (a) whole shell eggs sold primarily to retail consumers (the "shell egg" or "table egg" market) and (b) broken, pasteurized eggs sold in liquid or dried form primarily to restaurants, cafeterias, and food manufacturers (the "breaker" market). Historically, about 70% of layer hens produced eggs for the shell egg market, while the remaining 30% of layers produced eggs for the breaker market. A smaller but growing segment of the shell egg market involves "quality-differentiated" products—such as cage-free or organic eggs—that command retail premiums over eggs.

82. Egg production is spread across the United States, with significant production numbers in almost every state:




Figure 1[17]

83. While eggs are produced nationwide, production is concentrated in the Midwest. The top five egg producing states—Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented nearly half of all laying hens in the United States in 2024.

[17] https://www.nass.usda.gov/Charts_and_Maps/Poultry/eggmap.php




Figure 2[18]

**B. Consolidation in the Egg Industry**

84. Throughout most of the twentieth century the egg industry had a highly fragmented production structure that included thousands of independent farms.

85. In 1978, Watt Publishing Company began conducting industry surveys to provide data about the United States egg industry. The 1978 survey identified only thirty-four companies with flocks of one million or more hens, and those firms accounted for just 27 percent of the nation's laying hens.

86. In the decades that followed, an aggressive wave of mergers and acquisitions transformed the industry from a decentralized network of family operations into a tightly

[18] https://unitedegg.com/facts-stats/

concentrated oligopoly. Between 1900 and 1999, the number of farms in the United States producing eggs dropped from 5 million to under 1000. By 2000, Watt's survey listed 63 companies with 1 million or more hens, and they represented 78% of the nation's total flock.

87. Today the Egg Producer Defendants—Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods (sometimes referred to as the "Big Five")—collectively control nearly 50% of all U.S. laying hens.

88. Cal-Maine alone had nearly 45 million egg-laying hens in 2024, and it controlled approximately 20% of national egg sales.

89. The remainder of the shell egg market outside of the top producers is mostly made up of small producers.

90. Regional concentration can be far more acute; in California, for example, the four largest producers control approximately two-thirds of the state's hen inventory.

91. The rise of this "Big Five" cohort is directly traceable to serial acquisitions that eliminated scores of mid-sized rivals and absorbed their production capacity.

92. Cal-Maine's watershed moment occurred in 1988, when it tripled its flock overnight by purchasing Cargill's entire egg division. Since then, it has been the largest producer in the egg industry. The company has made at least twenty-five additional acquisitions.

93. Cal-Maine's other significant acquisitions include:

- **1999:** Hudson Brothers, Inc. of Guthrie, Kentucky, adding approximately 1.2 million layers
- **2008:** Tampa Farm Service, Inc. and Zephyr Egg Company, adding approximately 6 million layers.
- **2012:** Pilgrim's Pride and Maxim Production Co., adding approximately 4.9 million layers.
- **2016:** Foodonics International, adding approximately 3.1 million layers.

- **2019:** Mahard Egg Farm, adding approximately 3.9 million layers.
- **2022:** Red River Valley Egg Farm, adding 1.7 million layers.
- **2024:** Fassio Egg Farms, Inc., located in Erda, Utah, adding approximately 1.2 million layers, and ISE America, Inc., adding approximately 4.7 million laying hens with production operations in Maryland, New Jersey, Delaware and South Carolina.

94. Similarly, the other Egg Producer Defendants become dominant in the egg industry through a series of mergers and acquisitions. The following is a sample of recent acquisition activity by the other Egg Producer Defendants:

- **Rose Acre:** In 2020, Rose Acre announced it entered a joint venture with Weaver Brothers Inc. to purchase Opal Foods. At the end of 2019, Opal Foods had nearly 8 million layers.
- **Versova**: Versova began in 2016 through the roll-up of several established producers. It grew its capacity further by acquiring Willamette Egg Farms—adding over 3 million layers—and Rembrandt Foods (now known as Ovation Farms) in 2021.
- **Daybreak Foods**: In 2023, Daybreak Foods acquired Hen Haven, LLC and Schipper Eggs, LLC and in 20222 it acquired Konos, Inc. (d/b/a Vande Bunte Eggs).
- **Hillandale Farms**: In 2025, Hillandale Farms was acquired by Luxembourg-based company Global Eggs for over $1 billion. Global Eggs operates large egg producers around the world and has combined revenues of over $2 billion.

95. The Egg Producer Defendants are also vertically integrated: they own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

96. For example, in addition to its 45 million layers and 49 egg production facilities, Cal-Maine hatches the majority of its chicks in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine transports them to its own production

farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. After eggs are produced, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as egg products. Finally, Cal-Maine prepares its table-eggs and egg products to be picked up by customers, or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

97. Cal-Maine's vertical reach extends even further: it maintains its own +10 million-bird breeder program, giving it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020 investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour."




Figure 3[19]

98. Defendant Rose Acre also has a breeder flock. Independent producers without breeder flocks must source replacement pullets either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly— Hendrix Genetics and EW Group—further narrowing their options.

99. Hendrix Genetics and EW Group control the "parent flock," which produces the entire supply of pullets sold to downstream egg producers.

[19] Cal-Maine Foods, Inc., Investor Presentation (August 2020), https://calmainefoods.gcs-web.com/static-files/3775d1a2-4a86-44d4-a3be-22263fc9efb7.

100. This duopoly at the top of the supply chain functions as a structural chokepoint in the egg market which helps facilitate the producer-level conspiracy. The genetics firms, simply by acting in their own independent, profit-maximizing interest (i.e., restricting pullet supply to keep pullet prices high), have the effect of protecting the downstream collusive arrangement. Their actions, whether coordinated with producers or not, create a risk of input foreclosure, preventing other producers from easily expanding supply and stopping new entrants from competing away the supracompetitive egg prices.

101. Moreover, smaller companies do not have equal access to rebuild their flocks as quickly as the most dominant firms.

**C. Anticompetitive Conduct**

102. Historically the U.S. egg industry has been characterized by relatively stable prices. The prices received by egg producers fluctuated in a narrow range for most of the 20th century, with the industry regularly going through mild price-output cycles. Since the industry's consolidation in the 1980s and 1990s, however, cyclic fluctuations have become less prevalent, and the industry has been increasingly characterized by production rigidity, both in the face of rising prices and in the face of declining prices. Following the supply shocks during the 2020 COVID-19 pandemic, Defendants hatched their conspiracy to fully break the cycle and raise egg prices to the highest level on record.

103. In fact, during the first half of 2025, the average price of grade A egg prices shattered historical price records, going as high as $6.23 per dozen in March 2025.

104. While Egg Producer Defendants have attributed these price increases to supply disruptions caused by HPAI outbreaks beginning in late 2021, the price spikes exceeded what the flock losses explain.

105. The massive price increases are, instead, a product of Defendants' conspiracy.

106. Specifically, egg producers, including the Egg Producer Defendants, coordinated with each other to systematically increase the price of eggs by manipulating egg pricing benchmarks such as those published by Urner Barry and ECI.

### 1. Urner Barry and ECI provide egg price benchmarks.

107. Unlike other agricultural commodities like soy, coffee, and sugar traded on transparent public exchanges, eggs lack a regulated exchange, and price discovery has effectively been delegated to (i) Defendant Urner Barry, which issues the "Urner Barry quote" or "UB quote" which serves as a de facto pricing benchmark for eggs nationwide, and (ii) to Defendant ECI, a members-only platform which publishes trading-based prices among producers and serves as an information exchange and contract-setting tool for large-scale transactions.

108. Most egg pricing is anchored to daily wholesale quotations published by Defendant Urner Barry in its Price-Current report, a trade publication that serves as the bellwether for egg contracts nationwide. Urner Barry also publishes benchmarks or indexes that condense its reported quotations into numeric benchmarks used in commercial contracts. Urner Barry's egg quotations (UB quotes) have been the industry's benchmark for over a century.

**Eggs**

Urner Barry's egg quotations have been the industry's benchmark for over a century. With information ranging from shell eggs, egg products, CA compliance, breaking stock, and more, COMTELL subscribers are updated several times a day on the most impactful market conditions. European Egg customers benefit from a global perspective through coverage on breaking stock, liquid, and dried egg from all the most popular production styles.



Figure 4[20]

109. Defendants and their co-conspirators were well aware that Urner Barry's Price-Current reports and indexes served as the de facto bellwether for egg pricing nationwide.

110. The overwhelming majority of wholesale egg contracts are based on Urner Barry's daily quotations as the reference price, meaning even small upward shifts in reported values immediately translate into higher prices for purchasers.

111. Cal-Maine's annual SEC filings during the Class Period confirm that "the majority of conventional shell eggs sold in the U.S. in the retail and foodservice channels are sold at prices that take into account, . . . quoted wholesale market prices, such as those published by Urner Barry."[21]

112. Urner Barry compiles its daily reports by soliciting information from producers, distributors, brokers, food service operators, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers. Urner Barry also takes into account prices gleaned from the Egg Clearinghouse, but as Karyn Rispoli, a managing editor at Urner Barry, said on a 2024 podcast, "[Egg Clearinghouse] rarely paints the entire picture, and that's where we [Urner Barry] come in. We do the work of gathering information that isn't being posted publicly on these trading platforms."[22]

113. Urner Barry's reporters collect data by telephone, email, text message each business day.[23]

---

[20] Urner Barry by Expana, *Impactful Benchmark Quotations, Indices, and Data Points*, https://www.comtell.com/Marketing/Market-Prices.
[21] *See, e.g.*, Cal-Maine Foods, Inc., Form 10-K Annual Report (July 19, 2022), https://calmainefoods.gcs-web.com/static-files/4fcc68f8-a380-476b-ba77-c45818ca897f.
[22] "Unscrambling the Dynamics of Egg Pricing with Market Reporter Karyn Rispoli, Urner Barry," at 12:53-13:03. *Poultry Leadership Podcast* (Feb. 20, 2024).
[23] *Id.* at 13:41-51.

114. Urner Barry knows this pricing information is important because it can have a "direct and significant" impact on Defendants and their co-conspirators operations.[24]

115. Because virtually all commercial egg transactions reference Urner Barry's numbers, even modest movements in Urner Barry's daily quotation instantaneously re-price billions of eggs in the pipeline. The leverage created by this centralization gave Defendants a powerful incentive to influence the benchmark.

116. Urner Barry purports to follow an "IOSCO-compliant" methodology that is supposed to prioritize reliable, impartial pricing data. An Urner Barry spokesperson stated that "We [Urner Barry] guard against the risk of manipulation by adhering to the IOSCO methodology."[25]

117. Urner Barry is audited every year by accountancy firm BDO USA P.C. ("BDO") for compliance with IOSCO standards. While Urner Barry claims that it has "passed every audit,"[26] recent reports suggest that BDO is not a reliable accounting firm and has consistently failed to meet United States accounting standards. In 2023, "[t]wo-thirds of [BDO's] audits picked for inspection fell short of US standards."[27]

118. While less than 5% of the egg transactions occur on the ECI, the marketplace still plays an outsized role in egg pricing, as Urner Barry incorporates transaction prices from ECI's spot market into its price quotes.

---

[24] *Id.* at 14:50:56.
[25] Jenny Ahn *et. al*, *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up,* Hunterbrook (Mar. 6, 2025) (https://hntrbrk.com/big-egg/).
[26] *Id.*
[27] https://www.bloomberglaw.com/bloomberglawnews/financialaccounting/X5OP4188000000?bna_news_filter=financial-accounting#jcite

119. The relatively small number of transactions on the ECI, combined with Defendants' dominant market position with respect to smaller producers, enabled the Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote. The dominant firms did not need to coordinate with hundreds of fringe producers; they only needed to coordinate among themselves in a way that artificially inflated the ECI prices.

120. Additionally, the ECI is a member-only platform comprised of farmers and ECI's egg buyers board. Historically, the board included industry executives (including Cal-Maine's founder), underscoring close producer involvement in the information channel that feeds benchmarks.

121. In these ways, Urner Barry and ECI amplify price swings led by the largest-volume producers and prevent independent, competitive decision-making by others.

### 2. Egg producers conspired to artificially increase the prices of eggs using Urner Barry egg price indices.

122. As explained above, egg pricing is anchored to daily wholesale quotations

123. published by Defendant Urner Barry.

124. This structural feature of the egg market ensures that any inflation in Urner Barry's benchmark prices is rapidly transmitted throughout the entire industry. Over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's quotations, and fewer than 5% of eggs are sold on the ECI spot market (which Urner Barry also takes into account). Cal-Maine, for instance, acknowledged in a press release that "a majority of [its] conventional eggs are sold based on market

quotes published by Urner Barry."[28] As a result, even modest artificial increases in reported prices cascade into higher prices for nearly every downstream transaction.

125. Because Urner Barry's pricing is based in substantial part on self-reported transaction data from dominant firms, it is inherently susceptible to manipulation. By submitting elevated prices, the Egg Producer Defendants can push Urner Barry's benchmark upward, knowing that the new higher price will be automatically applied to future contract deliveries.

126. This creates a self-reinforcing feedback loop. Elevated benchmark prices increase the revenue received on each sale, which in turn increases the baseline for the next round of reporting. The system thereby amplifies any upward movement and resists downward price corrections, particularly in a concentrated market where the largest players account for almost 50% of all production.

127. The opportunities for manipulation are exacerbated by the fact that most eggs sold in the U.S. are Conventional Eggs, whose prices are almost universally tied to Urner Barry quotations. Specialty and cage-free eggs—whose prices are more often linked to actual production costs under long-term contracts—did not experience nearly the same magnitude of price spikes during the conspiracy period.

128. For example, in the five months prior to the 2021 HPAI outbreak, cage-free eggs averaged $0.65 more per dozen than conventional eggs, reflecting higher production costs. By 2022, however, conventional egg prices—driven by Urner Barry indices—rose so sharply that they ***exceeded cage-free prices by $0.33*** on average. In 2023 and 2024, cage-free eggs were only 17%

---

[28] Cal-Maine Foods Reports Results for Third Quarter Fiscal 2023, https://calmainefoods.gcs-web.com/node/13221/pdf.

and 2% higher than conventional eggs, respectively. This inversion is inexplicable absent coordinated conduct in the conventional egg market.




Figure 5.[29]

129. This was not the first time the egg industry had been hit by a massive bird flu outbreak. The monthly reduction in the egg-laying flock size since 2022 was similar to those in 2015, when avian flu killed 43 million egg-laying hens. Nevertheless, prices since 2022 have risen ***more than three times*** more per lost hen than they did during the earlier outbreak.

[29] Jenny Ahn *et. al*, *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up,* Hunterbrook (Mar. 6, 2025) (https://hntrbrk.com/big-egg/) (citing USDA, Shell Eggs: Monthly USDA Cage-Free Shell Egg Report *and* U.S. Bureau of Labor Statistics, Eggs, grade A, large, per doz. Consumer Price Index Average Price Data).

130. Historical precedent underscores the risks inherent in such a system. In the poultry and other meat industries, companies have been accused of using price reporting agencies like Urner Barry to facilitate anticompetitive information sharing.

131. The same vulnerabilities exist in the egg market. Urner Barry's methodology allows for selective reporting, and the company does not verify every transaction reported by industry participants. Instead, it aggregates and "scrutinizes" the information according to its own proprietary methods, the details of which are not subject to public oversight.

132. This opaque process invites abuse in a market dominated by a handful of vertically integrated producers. The Egg Producer Defendants can monitor each other's reported prices, verify adherence to coordinated price levels, and punish deviations by reverting to benchmark-linked pricing in subsequent transactions.

133. Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes. Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply— and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.[30]

134. Indeed, from 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes.

[30] Jenny Ahn *et. al*, *Cracking Big Egg: Why the Industry's Narrative Doesn't Add Up,* Hunterbrook (Mar. 6, 2025) (https://hntrbrk.com/big-egg/).

135. Moreover, the Egg Producer Defendants were able to repopulate quickly relative to the 2015 outbreak due to their large size and vertical integration. For example, Cal-Maine lost a total of 3.7 million chickens to avian flu in two of its facilities in Kansas and Texas in December 2023 and April 2024, but by early November had added 8 million hens to its flock, more than recovering from its losses in just six months. In fact, Cal-Maine's total flock was actually 15% higher than it was before 2022.14

136. A key distinction from the 2015 HPAI episode is the unusually slow recovery of the layer flock. This slow response may be explained by structural constraints in the pullet pipeline originating from the upstream genetics duopoly. During the 2022-2024 "crisis," the parent flock (which produces the replacement layer hens) was itself dramatically reduced, from 3.1 million in 2021 to 2.5 million in 2025.

137. This upstream bottleneck explains how a producer-led conspiracy could have remained durable. This "managed scarcity" prevented normal market correction (i.e., new entry or expansion) that would have otherwise competed away supracompetitive prices.

138. Additionally, the actual domestic egg supply fell even less than the flock size, due to a significant reduction in egg export and an unprecedented increase in laying rate per hen, owing to improved genetics.

139. The U.S. egg price spike is even more puzzling when compared to Europe, which also saw a massive supply shortage in 2022 after 50 million layers were depopulated—compared to 43 million in the U.S. And yet, prices only rose about 30% in Europe from January 2022 to January 2023, compared to nearly 170% in the U.S.

140. The correlation between Urner Barry's quotations and conventional egg price spikes, combined with the absence of competitive market discipline, supports a strong inference

that Defendants used the Urner Barry system to communicate, monitor, and enforce supracompetitive pricing.

141. In this way, Urner Barry served as both the hub for exchanging competitively sensitive pricing information and the enforcement mechanism for maintaining elevated price levels. This dual role magnified the anticompetitive harm, depriving the marketplace of independent price setting and ensuring that the benefits of inflated prices accrued collectively to the Egg Producer Defendants.

142. The vertical integration of the Egg Producer Defendants further strengthened the effectiveness of this arrangement. With control over breeding, production, processing, and distribution, these firms could maintain tight supply discipline while ensuring that all their sales across all stages—reflected Urner Barry's elevated benchmarks.

143. Because of the Defendants' market concentration, deviations from Urner Barry's benchmarks could be swiftly detected and addressed. Any short-term gain from discounting would be outweighed by the risk of retaliation in future transactions, making adherence to coordinated prices the rational choice for all conspirators.

144. The resulting price increases have generated extraordinary profits for the Egg Producer Defendants. Cal-Maine, for example, reported gross margins approaching 40% during the conspiracy period, and in some quarters profits increased by nearly 950% compared to pre-2022 levels.

145. These profits came directly at the expense of egg purchasers, including Plaintiff and members of the Class, who paid vastly more for eggs than they would have in a competitive market.

146. The conduct described is inconsistent with unilateral, competitive behavior. It is instead indicative of a coordinated strategy, implemented through a centralized price reporting system, to fix, raise, and maintain egg prices at artificially high levels in violation of the Sherman Act and state law.

**3. Input price increases do not explain egg prices increases.**

147. Feed—primarily corn and soybean meal—is the major cost component in the production of shell eggs, accounting for more than half of farm production costs.

148. Fuel costs, typically propane or natural gas, is another input to poultry farming.

149. Data from the U.S. Bureau of Labor Statistics show that these cost inputs have decreased since 2022.

150. Cal-Maine's financial disclosures confirm that production costs have gone down, not up, as Cal-Maine's profits have skyrocketed.

151. Under competition, one would expect price paths to track costs and supply shocks. That has not been the case in the shell egg market. Instead, prices and costs have diverged, to the profit of shell egg producers.

**4. Both the DOJ and the NY Attorney General have opened investigations.**

152. On March 6, 2025, various news outlets, including *The Capitol Forum* and *The Wall Street Journal*, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them "to preserve documents about their

pricing conversations with customers and competitors, as well as communications with Urner Barry."[31]

153. In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing it stated that it received a civil investigative demand from DOJ in March 2025.

154. After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public those same eggs cost $3.03—***a 62.7 percent decrease***. Egg prices at retail also dropped around this time. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

[31] Dave Michaels, "Justice Department Opens Probe of Sharp Surge in Egg Prices," *The Wall Street Journal* (March 7, 2025).




Figure 6.[32]

[32] Gavin A. Sicard and Hal Singer, *Did DOJ's Investigation of the Egg Industry Cause Egg Prices to Fall?*, The Sling (June 13, 2025) (https://www.thesling.org/did-dojs-investigation-of-the-egg-industry-cause-egg-prices-to-fall/).




Figure 7.[33]

155. On May 8, 2025, Senators Elizabeth Warren (D-Mass.) and Jim Banks (R-Ind.) released a letter in support of DOJ's investigation. In their letter, the senators were skeptical of the claims of egg producers and trade associations that recent avian flu outbreaks were the sole cause of high prices. They expressed that they "are concerned that record high egg prices reflect noncompetitive behavior among large producers." Additionally, the senators urged DOJ "to

[33] Gavin A. Sicard and Hal Singer, *Did DOJ's Investigation of the Egg Industry Cause Egg Prices to Fall?*, The Sling (June 13, 2025) (https://www.thesling.org/did-dojs-investigation-of-the-egg-industry-cause-egg-prices-to-fall/).

consider whether a precipitous drop in egg prices just days after reports of the investigation broke suggests that egg producers had conspired to artificially inflate prices."[34]

156. Most recently, in a 10-Q SEC filing published October 1, 2025, Defendant Cal-Maine, disclosed that it "received a subpoena from the State of New York requesting information and documents related to its investigation of anticompetitive conduct and high egg prices in the egg industry."[35]

**5. Prior actions against Defendants.**

157. The egg industry, including several of the Defendants named here, have previously been targeted by private litigants and government enforcers for anticompetitive and unfair business practices.

158. Starting in September 2008, egg producers, including Cal-Maine, Rose Acre Hillandale Farms, and Daybreak Foods, were named as defendants in numerous antitrust cases. In these actions, the plaintiffs alleged, among other things, that, to raise the price of eggs, these egg producers conspired to restrict egg production through a sham animal-welfare program that reduced the laying hen flock sizes. The cases were consolidated as a multi-district litigation in the Eastern District of Pennsylvania under the name *In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002. While some egg producers escaped liability, several, including Cal-Maine and Hillandale, settled the claims for millions of dollars.

159. In 2019, *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, an action brought by certain large buyers of egg products, was remanded out of the multi-district

[34] Letter to Gail Slater, Assistant Attorney General, from Senators Warrant and Banks, (May 8 , 2025) (https://www.warren.senate.gov/newsroom/press-releases/senators-warren-banks-in-bipartisan-letter-pushdoj-to-investigate-high-egg-prices-anticompetitive-behavior-by-egg-producers).
[35] Cal-Maine Foods, Inc., Form 10-Q (October 1, 2025).

litigation to the Northern District of Illinois, for trial. The case went to trial on October 17, 2023, against defendants including Cal-Maine and Rose Acre. On December 1, 2023, the jury returned a decision finding the defendants engaged in a conspiracy to fix the prices of eggs. The jury awarded the plaintiffs $17.8 million in damages ($53.3 million when trebled).

160. In 2020, the New York Attorney General alleged that Hillandale Farms exploited the COVID-19 pandemic to charge "unconscionably excessive" prices, justified by Urner Barry's indices, which themselves were based on data supplied by the industry. In the complaint, New York alleged that "Urner Barry's indices work like a feedback loop: Egg producers such as Hillandale tell Urner Barry their 'assessments' of egg prices; Urner Barry then repeats back to the egg industry their collective assessment, distilled into indexed prices; and egg producers such as Hillandale then use Urner Barry's indexed prices as benchmarks to price their eggs."[36] In 2021, the case was settled, and Hillandale agreed to donate 1.2 million eggs to local food banks throughout New York state.

161. In 2021, Alaska accused Urner Barry of aiding broiler producers in an "anticompetitive output restriction scheme" by serving as a conduit for competitively sensitive information and facilitating production cuts.[37]

#### 6. Defendants' systematic exchange of competitively sensitive information via Urner Barry Violates Section 1 of the Sherman Act.

162. Defendants' information exchange amounts to an unlawful agreement in violation of Section 1 of the Sherman Act.

163. In 1996, FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy"). The 1996 Policy gave guidance to the health care industry on

---

[36] Verified Petition, *New York v. Hillandale Farms Corporation, et al.*

[37] Complaint, *Alaska v. Agri Stats, Inc. et al.*, No. 3AN-21-04632CI (Sup. Ct. Alaska).

various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. Among other things, the 1996 Policy provided an "antitrust safety zone" for information exchanges. According to the 1996 Policy, an information exchange that fell within the safety zone was unlikely to raise antitrust concerns and would unlikely be challenged by the agencies. In subsequent years, the agencies used this safety zone as a general guideline for the legality of information exchanges in other industries.

164. The 1996 Policy was recently withdrawn by the DOJ. But while it was operative, to qualify for the safety zone, the information exchange would have had to meet the following requirements:

- The information exchange was managed by a third-party, like a trade association or government agency;
- the information provided by participants was relatively old (*e.g.*, more than three months old); and
- the information was aggregated to protect the identity of the underlying sources, and enough sources were aggregated to prevent competitors from linking particular data to an individual source.

165. The agencies published this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs." It was important to the agencies that "providers [were] aware of the potential antitrust consequences of information exchanges among competitors." The agencies explained that these conditions were carefully crafted to balance a competitor's individual interests in obtaining useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

166. DOJ has recently demonstrated a renewed focus on prosecuting anticompetitive information sharing. As a result, on February 3, 2023, DOJ withdrew three antitrust policy

statements, including the 1996 Policy discussed above. Critically, when announcing the withdrawal, DOJ said that ***"the statements are overly permissive on certain subjects, such as information sharing, and no longer serve their intended purposes of providing encompassing guidance to the public on relevant . . . competition issues in today's environment."***

167. The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."[38]

168. Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades commented on DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

---

[38] Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023, US DOJ (Feb. 2, 2023).

169. Expanding further, at the 2024 American Bar Association Antitrust Spring Meeting, DOJ antitrust division attorney Kathleen Kiernan stated that "information may be a couple of years old" and still run afoul of antitrust laws forbidding anticompetitive information exchanges. She emphasized that "DOJ looks at the nature of information exchanged and the age of the information . . . there's not a one-size-fits-all approach to ensuring information exchanges have 'absolutely no concern' for antitrust enforcers."[39]

170. Later in 2024, DOJ filed a Statement of Interest in *In re Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), where it reiterated its stance against anticompetitive information exchanges. In the Statement, DOJ stated that it filed the Statement to make clear that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[40]

171. DOJ's position has not changed during the current Administration. In March 2025, Ryan Tansey, the section chief of the DOJ antitrust division's Washington Criminal Section, said at a conference "If I make no other point today, I just want to be very clear that that is not correct. . . . Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny."[41]

---

[39] Chris May, "Exchanges of 'years-old' labor market data still create antitrust risk, US DOJ official says," mLex (April 11, 2024), https://content.mlex.com/#/content/1555754/exchanges-of-years-oldlabor-market-data-still-create-antitrust-risk-us-doj-official-says.

[40] *In Re Pork Antitrust Litigation*, 18-cv-01776, Statement of Interest of the United States, Doc. 2616 at 3 (D. Minn. Oct. 1, 2024).

[41] Chris May, "Outsourced pricing doesn't 'skirt' antitrust liability, US DOJ official says," mLex (March 11, 2025), https://content.mlex.com/#/content/1637762/outsourced-pricing-doesn-t-skirtantitrust-liability-us-doj-official-says?referrer=portfolio_openrelatedcontent.

172. That same month, DOJ submitted a Statement of Interest in *In re Multiplan Health Insurance Provider Litigation*, 1:24-cv-06795 (N.D. Ill.), in which it stated that "[c]oncerted action is conduct that joins together separate decisionmakers and thus deprives the marketplace of independent centers of decisionmaking. . . . Such joint action can take a variety of forms, from a written contract, to a trust agreement, to a secret conspiracy, to ***the joint delegation of decisionmaking power to a common agent***."[42] (emphasis added; quotations and citations omitted).

173. Considering DOJ's position that information exchanges can be anticompetitive regardless of their exact form, Defendants' information exchange violates Section 1 of the Sherman Act. Defendants' information exchange existed for the purpose of "depriv[ing] the marketplace of independent centers of decisionmaking,"[43] increasing egg prices above competitive levels, and maintaining those supracompetitive prices.

**7. "Plus Factors" in the egg industry provide additional evidence of a conspiracy.**

174. Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[44] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the

---

[42] *In re Multiplan Health Insurance Provider Litigation*, 1:24-cv-06795, Statement of Interest of the United States, Doc. 382 at 2 (N.D. Ill. Mar. 27, 2025).
[43] *Id.*
[44] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[45]

175. Here, several plus and super plus factors support the plausible inference that Defendants are members of a per se unlawful price fixing cartel. These include: (1) Defendants' exchange of competitively sensitive information; (2) the presence of a price-verification scheme; (3) a motive to conspire; (4) opportunities and invitations to collude; (5) an increasingly concentrated market; (6) high barriers to entry; and (7) a commodity product.

176. ***First***, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[46] As described above, Defendant Urner Barry compiles daily market reports by soliciting pricing information from producers, distributors, brokers, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers. Egg producers, such as the Egg Producer Defendants, are able to maximize their prices by matching the benchmarks Urner Barry calculates based on the transaction data it receives. The data Urner Barry uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively-sensitive nature. Because an egg producer would be competitively disadvantaged by sharing private data unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors. Moreover, since it is well known in the egg industry that over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's price quotations, each individual Egg Producer Defendant can be reasonably certain that the other Egg Producer

[45] *See id.* at 396-97.
[46] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

Defendants are supplying their competitively sensitive information to Urner Barry and are using the pricing benchmarks Urner Barry provides to maximize their egg prices.

177. The risk of collusion is further heightened because Urner Barry disseminates forward-looking forecasts to its subscribers. By jointly relying on the same projections of future supply, demand, and pricing, the Egg Producer Defendants could align their expectations and production plans around shared market outlooks—coordinating not only current pricing but anticipated future conditions. Such forward-looking data magnifies the anticompetitive potential of Urner Barry's system by enabling the Egg Producer Defendants to adjust production and pricing behavior in parallel based on common forecasts.

178. ***Second***, Urner Barry provides participating egg producers with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[47] With Urner Barry, egg producers, such as the Egg Producer Defendants, are able to see benchmarks that measure where an egg producer stands in relation to others in their market. These benchmarks are based on actual transactions. This type of price verification makes little sense absent collusion.

179. ***Third***, Urner Barry provides egg producers, including the Egg Producer Defendants, with a motive to conspire by advertising that Urner Barry provides valuable information to support maximizing profits.

180. ***Fourth***, Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy.

---

[47] *Id*. at 1601.

181. The Egg Producer Defendants are members of UEP and AEB (American Egg Board), national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

182. For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

183. Moreover, employees of the Egg Producer Defendants have been on the board of UEP. For instance, In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

184. Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in Kraft was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs.[48] UEP Certified is still in force today.

185. Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period, including employees of Rose Acre, Daybreak, and Urner Barry. Urner Barry markets this event as "a must-attend event for decisionmakers in the protein industry . . . Where the protein industry's most influential members

---

[48] *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11-CV-8808, 2024 WL 4346418, at *5 (N.D. Ill. Sept. 30, 2024)

go to network, learn and advance their professional development."32 Employees of Defendants have even been seen together at these conferences. As shown in Figure 8 below, Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a guest speaker at the conference. Finally, Defendants, including at least Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.



*Wonderful weather and good company led to smiles all around for (L to R) Michele and Arron Heironimus, Rose Acre; Scott, Becky and Roger Seger, Wabash Valley; Urner Barry's Rick Brown; and Mickey Seger.*

Figure 8.[49]

186. ***Fifth***, the egg market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large egg producers, including the Egg Producer Defendants, have grown exponentially through acquisitions. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

187. ***Sixth***, egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs.

---

[49] Urner Barry's Reporter, *Annual Market Outlook 2011*, https://www.urnerbarry.com/reporter/issues/ReporterV6N3_WEB.pdf

188. Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment.

189. Potential new entrants would also need to displace long-standing customer relationships.

190. Thus, new entrants into the market are unlikely to discipline cartel pricing.

191. ***Seventh***, Eggs are a fungible commodity with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

192. Government grading standards make eggs functionally identical, eliminating non-price competition and simplifying the detection of price deviations.

193. Eggs also exhibit relatively inelastic demand—i.e., consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period.

194. As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter. A $1-$2 increase in an item we purchase once a month is not that big of deal in the grand scheme of things."[50]

195. Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Small artificial reductions in supply

[50] Cal-Maine 2Q 2025 Investor Presentation (January 2025).

can yield disproportionately large increases in price and profit for producers, including Defendants.

## V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

196. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among the Egg Producer Defendants has been restrained or eliminated with respect to egg prices;
- The price of eggs has been fixed, stabilized, or maintained at artificially high levels; and
- Individuals have been deprived of free and open competition.

197. Defendants' violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for eggs than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of overcharges paid on their egg purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement and information exchange are per se unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

198. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiff define such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

### A. The Relevant Product Market is Shell Eggs.

199. To the extent a relevant product market needs to be defined in this action, it is the market for conventional "shell eggs", also known as "table eggs." Shell eggs are eggs in the form most familiar to buyers: fresh, uncooked, and in an intact shell. Most shell eggs are sold at retail outlets such as grocery and convenience stores.

200. According to the USDA, in 2023, approximately 70% of eggs produced in the United States were sold as shell eggs. The remaining 30% of eggs produced in the United States were sold as egg products (i.e. shell eggs broken and sold in liquid, frozen, or dried form).

201. Conventional shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods.

202. Additionally, many egg consumers prefer the flavor and texture of freshly-cracked shell eggs over egg products. Egg buyers also value shell eggs because they generally do not contain additives, preservatives, or stabilizers, like egg products.

203. "Conventional" shell eggs are differentiated from "specialty" shell eggs which include cage-free, organic, brown, free-range, pasture-raised, or nutritionally enhanced shell eggs. Conventional shell eggs make up the majority of shell eggs sold in the United States. In 2024, conventional shell eggs held almost three-quarters of the U.S. shell egg market, followed by cage free eggs at about 23.2 percent, and pasture-raised at less than five percent.

204. Accordingly, there are no reasonable substitutes for shell eggs and they are a distinct product market.

**B. The Relevant Geographic Market is the United States.**

205. Should a geographic market need to be defined in this action, it is the United States. The Egg Producer Defendants produce and distribute eggs through locations across the United States and have increased egg prices nationwide.

## VI. STATUTE OF LIMITATIONS AND TOLLING

206. Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged until shortly before filing this action.

207. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

208. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when news of the DOJ's investigation into egg prices broke.

209. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## VII. CLASS ACTION ALLEGATIONS

210. Plaintiff repeats and re-alleges every allegation above as set forth above.

211. **Nationwide Class:** Pursuant to Federal Rule 23(b)(1) and (2) and seeking equitable and injunctive relief, Plaintiff brings this suit on his behalf and on behalf of a proposed class of all other similarly situated persons consisting of:

> All persons and entities who purchased shell eggs indirectly from one or more Egg Producer Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants, at any time during the period of January 1, 2022 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Nationwide Class").

212. Excluded from the Class are:

a. Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

b. The judges in this case and any members of their immediate families and judicial staff;

c. Any juror assigned to this action;

d. All governmental entities;

e. All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

f. All persons who are currently incarcerated.

213. **State Law Damages Class**: Pursuant to Federal Rule 23(b)(3) and seeking damages pursuant to state antitrust and consumer protection laws, as well as common law unjust enrichment, Plaintiff brings this suit on his behalf and on behalf of a proposed class of all other similarly situated persons consisting of:

> All persons and entities in Indirect Purchaser States[51] who purchased shell eggs indirectly from one or more Egg Producer Defendant, or from any division, subsidiary, predecessor, agent, or affiliate of such Egg Producer Defendants, at any time during the period of January 1, 2022 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "State Law Damages Class").

214. Excluded from the Class are:

a. Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

b. The judges in this case and any members of their immediate families and judicial staff;

c. Any juror assigned to this action;

d. All governmental entities;

e. All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

---

[51] The Indirect Purchaser States include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

f. All persons who are currently incarcerated.

215. The Classes consist of hundreds of thousands of members residing throughout the United States. Numerosity is therefore satisfied, and it would be impracticable to join all Class Members before the Court.

216. Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all the members of the Classes and which predominate over any individual issues. Included within the common question of law or fact are:

a. The definition of the relevant product market;

b. Defendants' market power within the relevant product market;

c. Whether Defendants exchanged competitively sensitive information;

d. Whether Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize prices for eggs;

e. The duration of the conspiracy alleged and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracy;

f. Whether such combination or conspiracy violated the federal antitrust laws;

g. Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this complaint, caused injury to the Plaintiff and other members of the Class;

h. Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on eggs;

i. The appropriate class-wide measure of damages; and

j. The nature of appropriate injunctive relief to restore competition in the egg market.

217. Plaintiff's claims are typical of the claims of the respective members of the Classes, in that he shares the above-referenced facts and legal claims or questions with the members of the

Classes, there is a sufficient relationship between the damage to Plaintiff and Defendant's conduct affecting Class Members, and Plaintiff has no interests adverse to the interests of other members of the Classes.

218. Plaintiff will fairly and adequately protect the interests of members of the Classes and has retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in antitrust litigation.

219. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable and no other group method of adjudication of all claims asserted is more efficient and manageable for at least the following reasons:

a. The liability claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

b. Absent certification of the Class, members of the Classes will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

c. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d. When the liability of Defendant has been adjudicated, claims of all members of the Classes can be administered efficiently and/or determined uniformly by the Court; and

e. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the Classes can seek redress for the harm caused to them by Defendants.

220. Because Plaintiff seeks relief for the entire Classes, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications

with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

221. Further, bringing individual claims would overburden the courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual members of the Classes would, as a practical matter, be dispositive of the interest of other members of the Classes who are not parties to the adjudication and may impair or impede their ability to protect their interests. Consequently, class treatment is a superior method for adjudication of the issues in this case.

## VIII. CLAIMS FOR RELIEF

### Count 1: Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) (On behalf of Nationwide Class for Injunctive Relief)

222. Plaintiff repeats and re-alleges every allegation above as set forth above.

223. Beginning at a time currently unknown to Plaintiff, but at least as early as January, 1 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

224. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of eggs and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

225. Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on eggs.

226. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to egg prices;
- The prices of eggs have been fixed, stabilized, or maintained at artificially high levels; and
- Plaintiff and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

227. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

228. Plaintiff and members of the Classes are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged.

**Count 2: Information Exchange**
**in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(On behalf of Nationwide Class for Injunctive Relief)**

229. Plaintiff repeats and re-alleges every allegation above as set forth above.

230. Beginning at a time currently unknown to Plaintiff, but at least as early as January, 1 2022 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

231. The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.


Case 4:25-cv-00999-FJG Document 1 Filed 12/30/25 Page 54 of 95

232. Plaintiff and members of the Classes have been injured and will continue to be injured in the form of overcharges on eggs. This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful per se. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

233. Plaintiff and members of the Classes are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged.

## VIOLATIONS OF STATE ANTITRUST LAWS

234. Plaintiff repeats and re-alleges every allegation above as set forth above.

235. The following Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiff and members of the State Law Damages Class.

236. Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

### Count 3: Violation of Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

237. Plaintiff repeats and re-alleges every allegation above as set forth above.

238. By reason of the conduct alleged, Defendant has violated ARIZONA REV. STAT. § 44-1401, *et seq.*

239. Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

240. Under Arizona law, "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." ARIZ. REV. STAT. § 44-1403.

241. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the shell egg market, a substantial part of which occurred within Arizona.

242. Defendants' violations of Arizona law were flagrant.

243. Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

244. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

245. By reason of the foregoing, Plaintiff and members of the Class are entitled to seek all forms of relief available under Arizona Revised Statutes Section 44-1401, *et seq*.

246. In conjunction with the filing of this Complaint, Plaintiff will serve a copy of this Complaint on the Arizona Attorney General in accordance with ARIZ. REV. STAT. ANN. § 44-1415(A).

**Count 4: Violation of California's Cartwright Act,
Cal. Bus. & Prof. Code § 16700 *et seq.***

247. Plaintiff repeats and re-alleges every allegation above as set forth above.

248. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

249. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. CAL. BUS. & PROF. CODE § 301.

250. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

251. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

252. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the shell egg market, a substantial part of which occurred within California.

253. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq*.

254. Members of the Class purchased shell eggs within the State of California during the Class Period. But for Defendant's conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

255. Plaintiff and Class Members with respect to purchases of shell eggs in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**Count 5: Violation of Colorado Antitrust Act,**
**Colo. Rev. Stat. Ann. § 6-4-101, *et seq.***

256. Plaintiff repeats and re-alleges every allegation above as set forth above.

257. Plaintiff and Class Members purchased Defendants' shell eggs within Colorado during the Class Period. But for Defendants' conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

258. The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations Colorado antitrust law for actual damages. *See* C.R.S. § 6-4-115 (emphasis added).

259. Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq*.

260. Members of the Class were injured with respect to purchases of shell eggs in Colorado and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

**Count 6: Violation of Connecticut Antitrust Act,**
**Colo. Gen. Stat. Ann. § 35-24, *et seq.***

261. Plaintiff repeats and re-alleges every allegation above as set forth above.

262. Members of the Class purchased Defendants' shell eggs within Connecticut during the Class Period. But for Defendants' conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

263. The Connecticut Antitrust Act specifically allows a private act of recovery for indirect purchasers by prohibiting a defendant from "assert[ing] a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* C.G.S.A. § 35-46a.

264. Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation C.G.S.A. § 35-24, *et seq*. Defendants' conducts and conspiracies restrained, suppressed, and eliminated the price competitive for shell eggs; artificially increased the demand for shell eggs, while depriving Plaintiff and Class Members of free and open competition. These acts resulted in Plaintiff and Class Members paying supracompetitive, artificially inflated prices for shell eggs.

265. Members of the Class were injured with respect to purchases of shell eggs in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Count 7: Violation of District of Columbia Antitrust Act,**
**D.C. Code § 28-4501, *et seq.***

266. Plaintiff repeats and re-alleges every allegation above as set forth above.

267. Members of the Class purchased Defendants' shell eggs within the District of Columbia during the Class Period. But for Defendants' conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

268. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

269. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia in violation of D.C. CODE § 28-4501, *et seq*.

270. Members of the Class were injured with respect to purchases of shell eggs in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Count 8: Violation of Hawaii Antitrust Act,**
**Haw. Rev. Stat. Ann. § 480-1, *et seq.***

271. Plaintiff repeats and re-alleges every allegation above as set forth above.

272. Members of the Class purchased shell eggs within Hawaii during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

273. The Hawaii Antitrust Act specifically allows a private act of recovery for indirect purchasers. *See* HRS § 480-13.3.

274. Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation of H.S.R. § 480-1, *et seq*.

275. Members of the Class were injured with respect to purchases of shell eggs in Hawaii and are entitled to all forms of relief, including actual damages, as well as interest and reasonable attorneys' fees and costs.

**Count 9: Violation of Illinois Antitrust Act,**
**740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.***

276. Plaintiff repeats and re-alleges every allegation above as set forth above.

277. Members of the Class purchased Defendants' shell eggs within the State of Illinois during the Class Period. But for Defendants' conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

278. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN.10/7(2).

279. Defendants entered into contracts or engaged in a combination or conspiracy to artificially increase the demand for shell eggs sold within the State of Illinois.

280. Members of the Class were injured with respect to purchases of shell eggs in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**Count 10: Violation of Iowa Competition Law,**
**Iowa Code § 553.1, *et seq.***

281. Plaintiff repeats and re-alleges every allegation above as set forth above.

282. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

283. Members of the Class purchased Defendants' shell eggs within the State of Iowa during the Class Period. But for Defendants' conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

284. Defendants contracted, combined or conspired to restrain trade in the shell eggs market, in violation of IOWA CODE § 553.1, *et seq*.

285. Members of the Class were injured with respect to purchases of shell eggs in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**Count 11: Violation of Kansas Restraint of Trade Act,**
**Kan. Stat. Ann. § 50-101, *et seq.***

286. Plaintiff repeats and re-alleges every allegation above as set forth above.

287. The Kansas Restraint of Trade Act aims to prohibit practices which, among other things, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

288. Members of the Class purchased shell eggs within the State of Kansas during the Class Period.

289. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

290. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

291. Members of the Class were injured with respect to purchases of shell eggs in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**Count 12: Violation of Maine's Antitrust Statute,**
**Me. Rev. Stat. Ann. Tit. 10 § 1101, *et seq.***

292. Plaintiff repeats and re-alleges every allegation above as set forth above.

293. Members of the Class purchased shell eggs within the State of Maine during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

294. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

295. Members of the Class were injured with respect to purchases of shell eggs in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**Count 13: Violation of Maryland's Antitrust Statute,**
**Md. Code Ann. § 11-204(A),** ***et seq.***

296. Plaintiff repeats and re-alleges every allegation above as set forth above.

297. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

298. Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE ANN. § 11-209(b)(2)(i).

299. Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

300. Members of the Class were injured with respect to purchases of shell eggs in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**Count 14: Violation of the Michigan Antitrust Reform Act,**
**Mich. Comp. Laws § 445.771,** ***et seq.***

301. Plaintiff repeats and re-alleges every allegation above as set forth above.

302. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq*.).

303. Members of the Class purchased Defendants' shell eggs within the State of Michigan during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

304. Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

305. Members of the Class were injured with respect to purchases of shell eggs in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**Count 15: Violation of the Minnesota Antitrust Law,**
**Minn. Stat. § 325D.49 *et seq.* & 325D.57 *et seq.***

306. Plaintiff repeats and re-alleges every allegation above as set forth above.

307. The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into . . . whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

308. Members of the Class purchased Defendants' shell eggs the State of Minnesota during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

309. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

310. Members of the Class were injured with respect to purchases of shell eggs in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**Count 16: Violation of the Mississippi Antitrust Statute,**
**Miss. Code Ann. § 75-21-1, *et seq.***

311. Plaintiff repeats and re-alleges every allegation above as set forth above.

312. Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

313. "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, among other things, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

314. Members of the Class purchased shell eggs within the State of Mississippi during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

315. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

316. Members of the Class were injured with respect to purchases of shell eggs in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**Count 17: Violation of the Nebraska Junkin Act,**
**Neb. Rev. Stat. § 59-801, *et seq.***

317. Plaintiff repeats and re-alleges every allegation above as set forth above.

318. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

319. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060.

320. Members of the Class purchased shell eggs within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

321. Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

322. Members of the Class were injured with respect to purchases of shell eggs in Nevada in that at least thousands of sales of shell eggs took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

323. Accordingly, Plaintiff and Class Members are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 18: Violation of the Nevada Unfair Trade Practices Act,**
**Nev. Rev. Stat. § 598A.010, *et seq.***

324. Plaintiff repeats and re-alleges every allegation above as set forth above.

325. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

326. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060.

327. Members of the Class purchased shell eggs within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

328. Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

329. Members of the Class were injured with respect to purchases of shell eggs in Nevada in that at least thousands of sales of shell eggs took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

330. Accordingly, Members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 19: Violation of New Hampshire's Antitrust Statute,**
**N.H. Rev. Stat. Ann. Tit. XXXI, § 356, *et seq.***

331. Plaintiff repeats and re-alleges every allegation above as set forth above.

332. Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

333. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

334. Members of the Class purchased Defendants' shell eggs within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

335. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II). Defendants established, maintained or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq*.

336. Members of the Class were injured with respect to purchases of Defendants' shell eggs in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**Count 20: Violation of the New Mexico Antitrust Act,**
**N.M. Stat. Ann. § 57-1-1, *et seq.***

337. Plaintiff repeats and re-alleges every allegation above as set forth above.

338. The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

339. Members of the Class purchased shell eggs within the State of New Mexico during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

340. Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

341. Members of the Class were injured with respect to purchases of shell eggs in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 21: Violation of Section 340 of the New York General Business Law,**
**N.Y. Gen. Bus. Law § 340, *et seq.***

342. Plaintiff repeats and re-alleges every allegation above as set forth above.

343. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

344. Members of the Class purchased shell eggs within the State of New York during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

345. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

346. Members of the Class were injured with respect to purchases of shell eggs in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq*.

**Count 22: Violation of the North Carolina General Statutes,**
**N.C. Gen. Stat. § 75-1, *et seq.***

347. Plaintiff repeats and re-alleges every allegation above as set forth above.

348. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

349. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

350. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

351. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class Members have been injured in their business or property and are threatened with further injury.

352. Because of the foregoing, Members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq*.

**Count 23: Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code § 51-08.1-01, *et seq.***

353. Plaintiff repeats and re-alleges every allegation above as set forth above.

354. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq*.

355. Members of the Class purchased shell eggs within the State of North Dakota during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

356. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51-08.1-08.

357. Defendants' violations of North Dakota law were flagrant.

358. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

359. As a direct and proximate cause of Defendants' unlawful conduct, Members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq*.

**Count 24: Violation of the Oregon Antitrust Law,**
**Or. Rev. Stat. § 646.705, *et seq.***

360. Plaintiff repeats and re-alleges every allegation above as set forth above.

361. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

362. Members of the Class purchased shell eggs within the State of Oregon during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

363. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

364. Members of the Class were injured with respect to purchases of shell eggs within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**Count 25: Violation of the Rhode Island Antitrust Act,**
**6 R.I. Gen. Laws § 6-36-1, *et seq.***

365. Plaintiff repeats and re-alleges every allegation above as set forth above.

366. The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade

and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

367. Members of the Class purchased shell eggs within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

368. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

369. Members of the Class were injured with respect to purchases of shell eggs in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**Count 26: Violation of the South Dakota Antitrust Statute,**
**S.D. Codified Laws § 37-1-3.1, *et seq.***

370. Plaintiff repeats and re-alleges every allegation above as set forth above.

371. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

372. Members of the Class purchased shell eggs within the State of South Dakota during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

373. Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

374. Members of the Class were injured with respect to purchases of shell eggs in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Count 27: Violation of the Tennessee Trade Practices Act,**
**Tenn. Code § 47-25-101, *et seq.***

375. Plaintiff repeats and re-alleges every allegation above as set forth above.

376. The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, among other things, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

377. Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

378. Defendants competed unfairly and colluded by meeting to restrain output, artificially increase demand, divide markets, and otherwise restrain trade as set forth, in violation of TENN. CODE ANN. § 47-25-101, *et seq*.

379. Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for shell eggs was restrained, suppressed, and eliminated throughout Tennessee; (2) artificially increase the demand for shell eggs throughout Tennessee; (3) Plaintiff and Class Members were deprived of free and open competition; and (4) Plaintiff and Class Members paid supracompetitive, artificially inflated prices for shell eggs.

380. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as shell eggs refined from Defendants shell eggs was sold in Tennessee.

381. Members of the Class purchased shell eggs within the State of Tennessee during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

382. Members of the Class were injured with respect to purchases of shell eggs in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Count 28: Violation of the Utah Antitrust Act,**
**Utah Code Ann. § 76-10-3101, *et seq.***

383. Plaintiff repeats and re-alleges every allegation above as set forth above.

384. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

385. Members of the Class purchased shell eggs within the State of Utah during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

386. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

387. Members of the Class were injured with respect to purchases of shell eggs in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

**Count 29: Violation of the West Virginia Antitrust Act,**
**W. Va. Code § 47-18-1, *et seq.***

388. Plaintiff repeats and re-alleges every allegation above as set forth above.

389. The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

390. During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

391. Members of the Class purchased Defendants' shell eggs within the State of West Virginia during the Class Period. But for Defendant's conduct set forth, the price of Defendants' shell eggs would have been lower, in an amount to be determined at trial.

392. Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq*., may bring an action for damages under W. Va. Code § 47-18-9.").

393. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

394. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they paid more for shell eggs than they otherwise would have paid absent Defendants' unlawful conduct.

395. As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiff and Class Members seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**Count 30: Violation of the Wisconsin Antitrust Act,**
**Wis. Stat. § 133.01, *et seq.***

396. Plaintiff repeats and re-alleges every allegation above as set forth above.

397. Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

398. Members of the Class purchased shell eggs within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

399. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

400. Defendants contracted, combined or conspired in restraint of trade or commerce of shell eggs, with the intention of injuring or destroying competition, in violation of WIS. STAT. § 133.01, *et seq*.

401. Members of the Class were injured with respect to purchases of Defendants' shell eggs in Wisconsin in that the actions alleged substantially affected the people of Wisconsin, with

at least thousands of consumers in Wisconsin paying substantially higher prices for shell eggs in Wisconsin.

402. Accordingly, Members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## <u>VIOLATIONS OF STATE UNFAIR AND TRADE PRACTICES LAWS</u>

403. Plaintiff repeats and re-alleges every allegation above as set forth above.

404. Defendants engaged in unfair competition and unfair/unconscionable or deceptive acts or practices in violation of the state consumer protection statutes identified below by entering into the combination, conspiracy, or agreement to unreasonably restrain trade in the market for eggs.

405. To the extent deception is required under the state laws below, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for eggs.

406. Accordingly, consumers and other indirect purchasers of shell eggs were induced into purchasing, and will continue to purchase, shell eggs at inflated prices. Plaintiff and members of the State Law Damages Class could not reasonably have avoided injury from Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of eggs.

407. The following Claims for Relief are pleaded under the laws of each State or jurisdiction identified below, on behalf of Plaintiff and members of the State Law Damages Class.

### Count 31: Violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.*

408. Plaintiff repeats and re-alleges every allegation above as set forth above.

409. Through the conduct alleged, Defendants have violated ARK. CODE § 4-88-101 *et seq*.

410. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the shell egg market, a substantial part of which occurred within Arkansas.

411. Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

412. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Class concerning Defendants' unlawful activities and artificially inflated prices for shell eggs. They concealed, suppressed, and omitted facts would have been important to members of the Arkansas Class as they related to the cost of products they purchased.

413. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in shell eggs by making public statements that were not in accord with the facts.

414. Defendants' statements and conduct related to the price of their products were deceptive as they had the tendency or capacity to mislead members of State Law Damages Class to believe that they were purchasing shell eggs at prices established by a free and fair market.

415. The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of ARK. CODE § 4-88-107(a)(10).

416. As a direct and proximate result of Defendants' unlawful conduct, members of the State Law Damages Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for shell eggs due to Defendants' unlawful conduct.

417. Accordingly, members of the State Law Damages Class seek all relief available under the Arkansas Deceptive Trade Practices Act.

**Count 32: Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

418. Plaintiff repeats and re-alleges every allegation above as set forth above.

419. CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

420. As alleged throughout this Class Action Complaint, Defendants engaged in unfair, deceptive, and/or unlawful practices in violation of California's Unfair Competition law by, at a minimum making material misrepresentations about the price of shell eggs.

421. As indicated by statements of California and federal policy, Defendants' grossly excessive and unfair shell egg pricing violates public policy and is, as such, unlawful under CAL. BUS. & PROF. CODE § 17200.

422. Defendants' unfair, unlawful and/or deceptive activity alleged caused members of the Class to purchase shell eggs at inflated prices. Accordingly, members of the Class have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

423. Plaintiff and members of the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. BUS. & PROF. CODE § 3345; and for such other relief set forth below.

**Count 33: Violation of District of Columbia Consumer Protection Procedures, D.C. Code § 28-3901, *et seq.***

424. Plaintiff repeats and re-alleges every allegation above as set forth above.

425. Members of the Class purchased shell eggs for personal, family, or household purposes.

426. Through the conduct alleged, Defendants have violated D.C. Code § 28-3901, *et seq*.

427. Defendants are "merchants" within the meaning of D.C. Code § 28- 3901(a)(3).

428. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

429. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business or property and are threatened with further injury.

430. Because of the foregoing, Members of the Class are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq*.

**Count 34: Violation of Florida's Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq.***

431. Plaintiff repeats and re-alleges every allegation above as set forth above.

432. The Florida Deceptive & Unfair Trade Practices Act, FLA. STAT. § 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

433. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

434. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

435. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. See FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

436. Members of the Class purchased shell eggs within the State of Florida during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

437. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

438. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class Members have been injured in their business or property because of overcharges for shell eggs and are threatened with further injury.

439. Because of the foregoing, Plaintiff and the Class Members are entitled to seek all forms of relief, including injunctive relief pursuant to FLA. STAT. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

**Count 35: Violation of the Massachusetts Consumer Protection Act, Mass. Gen Laws Ch. 93a § 1, *et seq.***

440. Plaintiff repeats and re-alleges every allegation above as set forth above.

441. Through the conduct alleged, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, *et seq*.

442. Plaintiff and Class Members purchased shell eggs within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth, the price paid would have been lower, in an amount to be determined at trial.

443. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

444. Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

445. Plaintiff and Class Members purchased shell eggs, primarily for personal, family, or household purposes.

446. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business or property and are threatened with further injury.

447. Because of the foregoing, Plaintiff and Class Members are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under MASS. GEN. LAWS ch. 93A § 9.

**Count 36: Violation of the Missouri Merchandising Practices Act,**
**Mo. Ann. Stat., § 407-010 *et seq.***

448. Plaintiff repeats and re-alleges every allegation above as set forth above.

449. Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and

monopolization. MO. REV. STAT. § 407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and MO. REV. STAT. § 407.025, which provides for the relief sought in this count.

450. The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the State Law Damages Class concerning its unlawful activities and artificially inflated prices for shell eggs. It concealed, suppressed, and omitted facts that would have been important to Plaintiff and members of the State Law Damages Class as they related to the cost of shell eggs they purchased.

451. The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in shell eggs by making public statements that were not in accord with the facts.

452. The Defendants' statements and conduct related to the price of shell eggs were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the State Law Damages Class to believe that they were purchasing shell eggs at prices established by a free and fair market.

453. Plaintiff and Class Members purchased shell eggs for end use within the State of Missouri during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

454. Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

455. Plaintiff and Class Members were injured with respect to purchases of shell eggs in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**Count 37: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970,**
**Mont. Code § 30-14-103 *et seq*. and § 30-14-201 *et seq*.**

456. Plaintiff repeats and re-alleges every allegation above as set forth above.

457. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq*., and 30-14-201, *et seq.*

458. Defendants' unlawful conduct had the following effects: (1) the demand for shell eggs was artificially increased throughout Montana; (2) Plaintiff and Class Members were deprived of free and open competition; and (3) Plaintiff and Class Members paid supracompetitive, artificially inflated prices for shell eggs.

459. Plaintiff and Class Members purchased shell eggs, primarily for personal, family, or household purposes.

460. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

461. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30 14-103, *et seq*., and 30-14-201, *et seq*., and, accordingly, Plaintiff and Class Members seek all relief available under that statute.

**Count 38: Violation of the Nebraska Consumer Protection Act,**
**Neb. Rev. Stat. § 59-1602 *et seq*.**

462. Plaintiff repeats and re-alleges every allegation above as set forth above.

463. Through the conduct alleged, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

464. Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609. Defendants' conduct had a direct or indirect impact upon Plaintiff's and Class Members's ability to protect themselves.

465. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

466. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class Members have been injured in their business or property and are threatened with further injury.

467. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

468. Because of the foregoing, Plaintiff and Class Members seek all relief available under the statute, NEB. REV. STAT. § 59-1601, *et seq*.

**Count 39: Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. §598.0903, *et seq.***

469. Plaintiff repeats and re-alleges every allegation above as set forth above.

470. Through the conduct alleged, Defendants have violated NEV. REV. STAT. § 598.0903, *et seq*.

471. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

472. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

473. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

474. Defendants' conduct was willful.

475. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business or property and are threatened with further injury.

476. Because of the foregoing, Plaintiff and Class Members is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993

**Count 40: Violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. §358-a:1 *et seq.***

477. Plaintiff repeats and re-alleges every allegation above as set forth above.

478. Through the conduct alleged, Defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq*.

479. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

480. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

481. Defendants' conduct was willful and knowing.

482. Defendants' conduct had a direct or indirect impact upon Plaintiff's and Class Members's ability to protect themselves.

483. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

484. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class Members have been injured in their business or property and are threatened with further injury.

485. Because of the foregoing, Plaintiff and the Class Members are entitled to seek all forms of relief available under N.H. REV. STAT §§ 358-A:10 and 358-A:10-a.

**Count 41: Violation of the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq*.**

486. Plaintiff repeats and re-alleges every allegation above as set forth above.

487. Through the conduct alleged, Defendants have violated N.M. STAT. § 57-12-3, *et seq*.

488. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

489. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

490. Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and Class Members and the price paid by them for Defendants' oil as set forth in N.M. STAT. § 57-12-2E.

491. Defendants' conduct was willful.

492. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class Members have been injured in their business or property and are threatened with further injury.

493. Because of the foregoing, Plaintiff and Class Members are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

**Count 42: Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.***

494. Plaintiff repeats and re-alleges every allegation above as set forth above.

495. Through the conduct alleged, Defendants have violated N.C. GEN. STAT. § 75-1.1, *et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

496. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

497. Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

498. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

499. Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

500. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business or property and are threatened with further injury.

501. Because of the foregoing, Plaintiff and the Class Members are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**Count 43: Violation of the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1.1 *et seq.***

502. Plaintiff repeats and re-alleges every allegation above as set forth above.

503. Through the conduct alleged, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq*.

504. Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

505. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

506. Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

507. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

508. Defendants' conduct was willful.

509. Plaintiff and Class Members purchased shell eggs, primarily for personal, family, or household purposes.

510. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business or property and are threatened with further injury.

511. Because of the foregoing, Plaintiff and Class Members are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.

**Count 44: Violation of the South Carolina Unfair Trade Practices Act,
S.C. Code Ann. § 39-5-10, *et seq.***

512. Plaintiff repeats and re-alleges every allegation above as set forth above.

513. Through the conduct alleged, Defendants have violated S.C. CODE ANN. § 39-5-10, *et seq*.

514. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon Plaintiff's and Class Members's ability to protect themselves.

515. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

516. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the State Law Damages Class have been injured in their business and property and are threatened with further injury.

517. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE ANN. § 39-5-10, *et seq.*, and, accordingly, Plaintiff and the members of the State Law Damages Class seek all relief available under that statute.

**Count 45: Violation of the Vermont Consumer Protection Act,
Vt. Stat. Ann. Tit. 9, § 2451, *et seq.***

518. Plaintiff repeats and re-alleges every allegation above as set forth above.

519. Through the conduct alleged, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq*.

520. Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, among other things, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT. ANN. tit. 9, § 2453(a).

521. Plaintiff and Class Members purchased shell eggs within the State of Vermont during the Class Period. But for Defendants' conduct set forth, the price of shell eggs would have been lower, in an amount to be determined at trial.

522. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see* also *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

523. Defendants competed unfairly by restraining trade as set forth, in violation of VT. STAT. tit. 9, § 2453, *et seq*.

524. Defendants' violations of Vermont law were flagrant.

525. Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

526. Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

527. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class Members have been injured in their business or property and are threatened with further injury.

528. Plaintiff and Class Members were injured with respect to purchases of shell eggs in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**Count 46: Unjust Enrichment**
**(On behalf of the State Law Damages Class)**

529. Plaintiff repeats and re-alleges every allegation above as set forth above.

530. Through their conduct, Defendants caused damages to Plaintiff and to Class Members.

531. By falsely reporting prices, Defendants artificially increased the demand for their shell eggs. By purchasing shell eggs at an inflated price in the United States, which Defendants forced them to do, Plaintiff and the Class Members conferred a benefit on Defendants in the form of the inflated and unconscionable price of the product.

532. Defendants appreciated the benefit because, were consumers not to purchase shell eggs, Defendants would have no sales and make no money off shell egg sales in the aforementioned states.

533. Plaintiff and Class Members have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and the artificial increase in the demand of shell eggs to the economic detriment of Plaintiff and the Class. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants unconscionable sales, and unlawful acts.

534. Equity cannot in good conscience permit Defendants to be economically enriched for its unjust actions at Plaintiff and Class Members' expense and in violation of state law, and therefore restitution or disgorgement or both of such economic enrichment is required. It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Class.

535. Plaintiff and the members of the State Law Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiff and the members of the State Law Damages Class are entitled to the

establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the State Law Damages Class may make claims on a pro rata basis.

## IX. DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, respectfully ask the Court for a judgment that:

536. Certifies the Classes pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Classes, and declares Plaintiff as representatives of the Classes;

537. Appoints Plaintiff and his attorneys as class representatives and class counsel, respectively;

538. Enters judgment against Defendants, and in favor of Plaintiff and the Classes, holding Defendants liable for the antitrust violations alleged;

539. Awards a declaratory judgment that Defendants' price fixing for shell eggs was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for shell eggs in violation of the Sherman Act, § 1.

540. Grants permanent injunctive relief:

a. enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of preventing actual or potential rivals from gaining a foothold in the Relevant Market of shell eggs and eliminating or impairing the price discipline that would come from free and fair competition; and

b. requiring Defendants to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

541. Awards Plaintiff and the Classes actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged, plus interest in accordance with law;

542. Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendant's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

543. Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

544. Directs such further relief as it may deem just and proper.

## X. **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: December 30, 2025.

Respectfully submitted,

*/s/ Rex A. Sharp*
Rex A. Sharp, MO #51205
Isaac L. Diel, MO #39503
Sarah T. Bradshaw, MO #66276
Hammons P. Hepner, MO #77258
Hans D. Hodes, W.D. Mo. #KS-001335
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
sbradshaw@midwest-law.com
hhepner@midwest-law.com
hhodes@midwest-law.com

*Attorneys for Plaintiff John P. Ryan, Jr.*